**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN (GRAND RAPIDS)**

**IN THE MATTER OF:**

| | |
|---|---|
| Orbit Marketing, LLC<br>dba Climax Solar<br>dba Climax Electrical Service<br>dba Option 1 Genetics | Bankruptcy Case No. 24-01123-swd<br>Honorable Scott W. Dales<br>Chapter 7 |

                           Debtor.
_____/

**TRUSTEE'S MOTION FOR AUTHORITY TO SELL PROPERTY OF THE
BANKRUPTCY ESTATE PURSUANT TO 11 U.S.C. 363(b) AND PAYMENT OF
BROKER'S COMMISSION**

     Kelly M. Hagan, Trustee, by and through her counsel, Beadle Smith, PLC, hereby states for Trustee's Motion for Authority to Sell Property of the Bankruptcy Estate Pursuant to 11 U.S.C. 363(b), and Payment of Broker's Commission ("Motion") as follows:

     1.     On April 27, 2024, Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Reform Act of 1978, as Amended, Title 11, which was converted to a proceeding under Chapter 7 on August 14, 2024.

     2.     Kelly M. Hagan was appointed the duly qualified and acting Chapter 7 this matter.

     3.     Part of the bankruptcy estate of Orbit Marketing, LLC consists of real property commonly known as 598 Avenue A, Springfield, MI, more particularly described as a parcel of real estate located in the City of Springfield, Calhoun County, Michigan to wit:

SP City Sec 3 T2S R8W Com W 1/4 Post, N 00°32'52" W 48.54 Ft to POB, N 00°32'52" W 201.47 ft, S 89°48'42" E 233.02 Ft, S 00°32' 52" E 235.32 ft to N R/W of Ave A, N 87°09'10" W 182.81 Ft, N 14°31'01" W 26.82 ft, S 89°27'18" W 44.04 ft to POB 1.05 acres +/- (the "Real Property"). Debtor's interest in the Real Property became property of the bankruptcy estate pursuant to 11 U.S.C. §541.

     4.     Reach Outdoor, LLC held a judgment lien securing a judgment in the amount of $24,465.84 recorded in Liber 4814, Page 0586, Calhoun County, Michigan Register of Deeds ("Calhoun County Judgment Lien").

5. The Calhoun County Judgment Lien was avoided by the Trustee pursuant to 11 U.S.C. §547(b) and preserved for the benefit of the bankruptcy estate of Orbit Marketing, LLC pursuant to 11 U.S.C. §551, by order of this court dated September 23, 2024, docket number 181.

6. With the exception of unpaid real estate taxes which will be paid at closing, the Trustee has no knowledge of any other liens attaching to the Real Property.

7. To provide a benefit to creditors, it is necessary that the Real Property be sold in the administration of this Chapter 7 proceeding.

8. The Trustee has hired Weichert Realtors Platinum and NAI Wisinski of West Michigan as seller's broker ("Broker") to assist the Trustee in selling the Real Property. Broker's employment was approved by this Court on October 11, 2024, docket number 209. Broker is to be paid a commission of 4% with 3% to Buyer's Agent ("Broker's Commission"). Trustee seeks authority to pay the Broker's Commission at closing on the sale of the Real Property.

9. The Trustee has accepted an offer for the Real Property in the amount of $95,000.00 pursuant to the Purchase Agreement attached hereto as Exhibit A. This sale price is at the upper range of value determined by the Broker and the Trustee believes that this is a fair price.

10. The Trustee seeks approval for the payment of ordinary closing costs including transfer taxes, title insurance premium, prorated real property taxes and water bills etc.

11. The Calhoun County Judgment Lien shall be satisfied at the closing on the Real Property and paid to Kelly M. Hagan, Chapter 7 Trustee of the bankruptcy estate of Orbit Marketing, LLC. Trustee is seeking authority to discharge the Calhoun County Judgment Lien upon full payment.

12. The transfer of the Real Property by the Trustee will be "as is, where is".

13. The sale is subject to bankruptcy court approval.

14. In order to approve a sale of substantially all of the Debtor's assets outside the ordinary course of business pursuant to section 363(b), the court must find that the Debtor has articulated a sound business justification for the sale. *Stephens Indus., Inc. V. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986)*(citing Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp*.), 722 F.2d 1063, 1070 (2nd Cir. 1983)). "A sale of assets is appropriate if all provisions of

§363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors." *See, Matter of Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) quoting *In re Charlesbank Laundry Co.*, 37 B.R. 20, 22 (Bankr. D. Mass. 1983). In the present case, the Trustee has set forth a legitimate reason for the sale as it will provide funds to the bankruptcy estate for the distribution to creditors and the Real Property has been listed on the open market. In addition, the prompt sale will reduce administrative expenses associated with maintaining the Real Property including insurance and real estate taxes.

15. The Trustee believes that a sale of the Real Property is in the best interest of the estate and creditors.

**WHEREFORE**, the Trustee requests this Honorable Court enter the Order submitted herewith granting the Trustee authority to sell the Real Property for the sum of at least $95,000.00, payment of normal and customary closing costs charged the Seller, transfer taxes and final utility bills, Broker's Commission, for waiver of the fourteen-day stay period set forth in Federal Rules of Bankruptcy Procedure, Rule, 6004(h), and for such other and further relief this Court deems just and proper.

Respectfully submitted,

BEADLE SMITH, PLC

 /S/ Kevin M. Smith
By: Kevin M. Smith (P48976)
Attorneys for Trustee
P.O. Box 70656
Rochester Hills, MI 48307
(586) 850-1492
Dated: 10/21/24          Ksmith@bbssplc.com



**COMMERCIAL ALLIANCE OF REALTORS**

**BUY AND SELL AGREEMENT
FOR OFFICE, COMMERCIAL, INDUSTRIAL AND MULTI-FAMILY**

Office of ____**NAI Wisinski of West Michigan**____, BROKER, ____**Grand Rapids**____ (city), Michigan.

Phone: __(616) 776-0100__  Fax: __(616) 776-0101__  Email: _____

Offer Date: _____, _____ (time)

1. **Agency Disclosure.** The undersigned Buyer and Seller each acknowledge the Broker named above is acting as (choose one):
   ☒ Agent of the Seller ☐ Subagent of the Seller ☐ Agent of the Buyer ☐ Dual Agent (with written, informed consent of both Buyer and Seller)
   ☐ Other (specify): _____

2. **Buyer's Offer.** The undersigned Buyer hereby offers and agrees to purchase property located in the ____**Township**____ of ____**Springfield**____, ____**Calhoun**____ County, Michigan, commonly known as **598 Avenue A**_____,

   Permanent Parcel Number _____ and legally described as follows:
   See Exhibit G attached hereto.

   (the "Land"), together with all buildings, fixtures and improvements situated on the Land (the "Improvements"), and all equipment and other personal property listed on Exhibit D (the "Personal Property"), all of which is collectively referred to herein as the "Premises".

3. **Purchase Price.** The purchase price for the Premises is:
   **Ninety-Five Thousand and 00/100**_____

   Dollars ($__**95,000.00**__). Any allocation of the purchase price between Land, Improvements, and Personal Property shall be set forth on an attached Exhibit.

4. **Payment of Purchase Price and Financing.** Complete subparagraph "A" and subparagraph "B".

   A. **Terms of Payment.** The purchase price shall be paid at the closing by Buyer to Seller as indicated by "X" below (mark one box or the other under this subparagraph "A").
      ☒ **Cash.** Buyer shall pay the full purchase price to Seller upon execution and delivery of warranty deed and performance by Seller of the closing obligations specified in this Agreement.

      ☐ **Land Contract.** Buyer shall pay the full purchase price to Seller pursuant to the terms and conditions stated in the Commercial Alliance of REALTORS® Land Contract form, unless the parties mutually agree upon a different form of land contract, upon performance by Seller of the closing obligations specified in this Agreement. The Land Contract shall provide a down payment of $_____ and payment of the balance $_____ in _____ installments of $_____ or more, at Buyer's option, including interest at the rate of _____% per annum computed monthly, interest to start on date of closing, and first payment to become due _____ after date of closing. The entire unpaid balance will become due and payable _____ months after closing. Seller understands that consummation of the sale or transfer of the Premises shall not relieve Seller of any liability that Seller may have under the mortgage(s) to which the Premises are subject, unless otherwise agreed to by the lender or required by law or regulation. [subject to credit approval]

   B. **Financing.** Indicate by an "X" below which applies (mark one box or the other under this subparagraph "B").
      ☐ **No Financing Contingency.** Buyer's obligation to purchase the Premises is not contingent upon Buyer obtaining financing for all or any portion of the purchase price.

      ☐ **Financing Contingency.** Buyer's obligation to purchase the Premises is contingent upon Buyer obtaining financing for the purchase of the Premises that is acceptable to Buyer, in Buyer's sole and absolute discretion, within _____ (___) days of the Effective Date of this Agreement (the "Financing Contingency Period"). Buyer agrees to diligently pursue in good faith obtaining financing for the purchase of the Premises. If after making such diligent effort Buyer fails to obtain financing for the purchase of the Premises that is acceptable to Buyer within the Financing Contingency Period, then Buyer may terminate this Agreement without liability and receive a refund of any deposit by delivering a written notice of termination to Seller in accordance with this Agreement within the Financing Contingency Period. If Buyer does not deliver a written notice of termination to Seller within the Financing Contingency Period, then Buyer shall be deemed to have waived this financing contingency.

5. **Survey.** Seller shall provide Buyer with a copy of any existing survey of the Premises that Seller has in Seller's possession within five (5) days of the date of the Effective Date. In addition, (select one of the following):

   ☒ A new survey:
      ☐ ALTA showing all easements of record, improvements and encroachments, if any, and completed to the most current ALTA/NSPS Land Title Survey minimum requirements; or
      ☐ boundary survey with iron corner stakes and with all easements of record, improvements and encroachments, if any; or

   ☐ A recertified survey; or

   ☐ No new or recertified survey;

   shall be ☒ obtained by Buyer at Buyer's expense; or ☐ provided by Seller to Buyer at Seller's expense, within _____ (___) days after the title insurance commitment referenced in this Agreement has been provided by Seller to Buyer under the terms of Title Insurance paragraph contained in this Agreement.

 Buyer's Initials      Seller's Initials

Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property    Page 2 of 8

If Seller is responsible to provide a new or recertified survey under this paragraph and fails to do so within the required time, then Buyer may order the required survey at Seller's expense. If any matter disclosed in the new or recertified survey (or absent either, an existing survey) adversely and materially affects the value of the Premises or Buyer's intended use of the Premises, Buyer shall give seller written notice of the matter within ten (10) days after copies of both such survey and the title commitment (and all exception documents identified in the title commitment) referenced in this written Agreement are delivered to Buyer. If Seller fails to cure the matter within ten (10) days of receiving notice (the "Survey Cure Period"), Buyer shall have the right to terminate this Agreement by giving Seller written notice within ten (10) days after the expiration of the Survey Cure Period, otherwise Buyer's right to terminate this Agreement pursuant to this paragraph shall be deemed to have been waived. Other:

6. **Title Insurance.** At Seller's expense, Seller shall provide Buyer with a standard ALTA owner's policy of title insurance in the amount of the purchase price, effective as of the date of closing. A commitment to issue such policy insuring marketable title (as defined in this Agreement) vested in Buyer, including a tax status report, shall be ordered within seven (7) days after the Effective Date, and shall be delivered, with copies of all title exception documents, as soon as feasible thereafter. (Note that some title commitments do not report on the status of oil, gas, or mineral rights.) If any matter disclosed by the title commitment adversely and materially affects the value of the Premises or Buyer's intended use of the Premises, Buyer shall give Seller written notice of the matter within ten (10) days after copies of both the title commitment (and all exception documents identified in the title commitment) and survey referenced in this Agreement are delivered to Buyer. If Seller fails to cure the matter within ten (10) days of receiving written notice (the "Title Commitment Cure Period"), Buyer shall have the right to terminate this Agreement by giving Seller written notice within ten (10) days after the expiration of the Title Commitment Cure Period, otherwise Buyer's right to terminate this Agreement pursuant to this paragraph shall be deemed to have been waived. Other:

7. **Inspections.** After the Effective Date, Buyer and Buyer's agents shall have the right to enter upon the Premises during reasonable business hours for the purposes of conducting such inspections of the Premises that Buyer deems appropriate; provided, however, that such inspections shall not interfere with the rights of the tenants in possession. Buyer shall indemnify, defend and hold Seller and Broker harmless from and against any damage to persons or property caused by Buyer or Buyer's agents in conducting such inspections. Buyer shall have the right to terminate this Agreement if the inspections are not acceptable to Buyer by giving Seller written notice within forty-five (45) days after the Effective Date, otherwise the right to terminate shall be deemed to have been waived.

Buyer agrees that Buyer is not relying on any representation or statement made by Seller or any real estate salesperson regarding any aspect of the Premises, or this sale transaction, except as may be expressly set forth in this Agreement, a written amendment to this Agreement, or a disclosure statement separately signed by Seller. Accordingly, Buyer agrees to accept the Premises "as is" and "with all faults", except as otherwise expressly provided in the documents specified in the preceding sentence. Other:

8. **Closing Adjustments.** The following adjustments shall be made between the parties by the close of business on the closing date, with Buyer receiving a credit or assuming responsibility, as the case may be, for amounts attributable to time periods following the closing date:
   a. Rent for the month in which closing occurs;
   b. Prepaid rent for any month after the month in which closing occurs;
   c. Interest on existing indebtedness assumed by Buyer;
   d. Charges for any transferable service contracts assigned to Buyer described in Exhibit F;
   e. Utility deposits;
   f. Security deposits;
   g. Recoverable Expenses (as defined below). If the parties choose to prorate Recoverable Expenses, then Seller shall provide Buyer with an accounting of (i) any expenses that are recoverable from tenants under the applicable leases (collectively, "Recoverable Expenses"), including but not limited to, all operating or common area maintenance expenses, taxes, special assessment and insurance and (ii) the costs incurred by Seller with respect to such Recoverable Expenses. Furthermore, if the parties choose to prorate Recoverable Expenses under the applicable leases, no proration of taxes and/or special assessments shall be made at closing except as provided for in the proration for Recoverable Expenses, notwithstanding anything to the contrary contained herein. This provision shall survive the closing. Other:

After closing, any rent collected by Buyer including delinquent rent which includes rent for any period prior to the closing date, shall be applied by Buyer against amounts then due and owing from the particular tenant to the Buyer, with the balance, if any, paid to Seller on account of any delinquent rent owing to Seller. After closing, any rent collected by Seller for any period following closing shall be promptly paid to Buyer. After closing, Seller may not bring any collection against any tenant for delinquent rent owing to Seller.

9. **Property Taxes.** All property taxes first billed prior to the year of closing will be paid by Seller, without proration. All property taxes billed or to be billed in the year of closing will be paid as follows (choose one):
   ☐ No Proration:
       ☐ Buyer ☐ Seller shall pay the taxes billed in July.

       ☐ Buyer ☐ Seller shall pay the taxes billed in December.

   ☒ Calendar Year Proration. Combined per diem tax amount representing both the July bill and the December bill shall be calculated based on a 365 day year. Seller shall be responsible for the per diem total from January 1 to, but not including, the day of closing. Buyer shall be responsible for the difference between the total of the two tax bills and the Seller's share. If the amount of either tax bill is unknown on the day of closing, such amount shall be based on the prior years' tax bill.

Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property        Page 3 of 8

10. **Special Assessments (choose one):**
    - [X] Seller shall pay all special assessments which have become a lien on the Premises prior to the closing, whether due in installments or otherwise.
    - [ ] Seller shall pay all special assessments which have become a lien on the Premises prior to the closing, provided, however, that in the event a special assessment is payable in installments, Seller shall only be responsible for those installments covering the years prior to the year of closing, and Buyer shall be responsible for all installments covering all years after the year of closing. Installments of special assessments covering the year of closing shall be prorated using the same method set forth in this Agreement for the proration of real estate taxes.
    - [ ] Other:

11. **Conveyance.** Upon performance by Buyer of the closing obligations specified in this Agreement, Seller shall convey the marketable title to the Premises to Buyer by warranty deed or agree to convey marketable title by land contract or assignment, as required by this Agreement, including oil, gas and other mineral rights owned by Seller, if any, subject only to existing zoning ordinances, and the following matters of record: building and use restrictions, easements, oil and gas leases, and reservations, if any. As used herein, "marketable title" means marketable title within the meaning of the Michigan 40-Year Marketable Title Act (Mich. Comp. Laws §§ 565.101 et seq.).

    The following paragraph applies only if the Premises include unplatted land:
    Seller agrees to grant Buyer at closing the right to make (insert number) ___any___ division(s) under Section 108 (2), (3) and (4) of the Michigan Land Division Act. (if no number is inserted, the right to make divisions under the sections referenced above stays with any remainder of the parent parcel retained by Seller. If a number is inserted, Seller retains all available divisions in excess of the number stated; however, Seller and/or Broker do not warrant that the number of divisions stated is actually available.) If this sale will create a new division, Seller's obligations under this Agreement are contingent on Seller's receipt of municipal approval, on or before ___all___ (date), of the proposed division to create the Real Estate. Other:

12. **Warranties of Buyer.** Except as otherwise provided or acknowledged in this Agreement, Buyer represents and warrants to Seller as follows:
    a. The performance of the obligations of Buyer under this Agreement will not violate any contract, indenture, statute, ordinance, judicial or administrative order or judgment applicable to Buyer.
    b. There is no litigation or proceeding pending, or to Buyer's knowledge threatened, against or involving Buyer, and Buyer does not know or have reason to know of any ground for any such litigation or proceeding, which could have an adverse impact on Buyer's ability to perform, or Seller's interests, under this Agreement.
    c. In entering into this Agreement, Buyer has not relied upon any written or verbal representations made by Seller or any representative of Seller, including any real estate salesperson, regarding the Premises or any aspect of this transaction, which are not expressly set forth in this Agreement.
    d. Other:

13. **Warranties of Seller.** Except as otherwise provided or acknowledged in this Agreement, Seller represents and warrants to, and agrees with Buyer as follows:
    a. The performance of the obligations of Seller under this Agreement will not violate any contract, indenture, statute, ordinance, judicial or administrative order or judgment applicable to Seller or the Premises.
    b. There is no litigation or proceeding pending or to Seller's knowledge threatened against or involving Seller or the Premises, and Seller does not know or have reason to know of any ground for any such litigation or proceeding which could have an adverse impact on Seller's ability to perform under this Agreement or that could adversely affect Buyer's title or use of the Premises.
    c. Seller shall continue to operate the Premises in the ordinary course of business and maintain the Premises in a state of good condition and repair during the interim between the signing of this Agreement and the closing date.
    d. If a statement(s) of income and expense with respect to the operation of the Premises is (are) described in Exhibit A or an accounting of Recoverable Expenses is provided as Exhibit E, such statement(s) is (are) accurate for the period(s) designated in the statement(s).
    e. The information concerning written leases and tenancies not arising out of written leases described in Exhibit B is accurate as of the Effective Date, and there are no leases or tenancies with respect to the Premises other than those described in Exhibit B (the "Leases"). The warranties in this paragraph do not apply to oil and gas leases, if any. Except as otherwise described in the documents that will be delivered pursuant to the index of Exhibits:
        (1) All of the Leases are in full force and effect, no party thereto is in material default thereunder, and none of them have been modified, amended, or extended beyond what will be delivered per Exhibit B; with respect to renewal or extension options, options to purchase the Premises, advance payments in excess of one month, common area maintenance and utility fees, and security deposits, these items are set forth in the written leases described in Exhibit B.
        (2) The rents set forth are being collected on a current basis and there are no arrearages;
    f. If applicable, agreements for the payment of commissions to real estate brokers or agents are as described in Exhibit C ("Commission Agreements"). Real estate brokerage commission(s) will become owing in the event of a tenant's exercise of any existing options to renew, extend, or expand a lease term, or right or option to purchase the Premises as provided in any Commission Agreements produced by Seller and as described in Exhibit C.
    g. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is described in Exhibit F, the Exhibit lists all the Service Contracts currently in effect with respect to the Premises.
    h. With respect to underlying land contracts or mortgages, the sale will not accelerate indebtedness, increase interest rates, or impose penalties and sanctions.
    i. Other:

 

**Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property**   Page 4 of 8

14. **Damage to Premises.** If between the Effective Date and the closing date, all or any part of the Premises is damaged by fire or natural elements or other causes beyond Seller's control that cannot be repaired prior to the closing date, or any part of the Premises is taken pursuant to any power of eminent domain, Seller shall immediately notify Buyer or such occurrence, and either Seller or Buyer may terminate this Agreement by written notice to the other within fifteen (15) days after the date of damage or taking. If neither elects to terminate this Agreement, there shall be no reduction in the purchase price and, at closing, Seller shall assign to Buyer whatever rights Seller may be with respect to any insurance proceeds or eminent domain award.

15. **Closing.** The closing shall be held on or before ___December 1, 2024___ (date) and as promptly as practical after all necessary documents have been prepared. An additional period of ___five___ ( 5 ) days shall be allowed for closing to accommodate delays in title work or the correction of title defects and/or survey problems which can be readily correctable, delays in obtaining any required inspections, surveys or repairs, delays in completing Environmental Site Assessments, Baseline Environmental Assessment or Due Care Plan/Section 7a Compliance Analysis (if such assessments or plans were ordered in a timely manner), or if the terms of purchase require participation of a lender and the lender has issued a commitment consistent with the requirement but is unable to participate in the closing on or before the required date. Other:

16. **Possession.** Seller shall tender to Buyer possession of the Premises upon completion of the closing, subject to all existing leases and rights of tenants in possession. Other:

17. **Seller's Closing Obligations.** At closing, Seller shall deliver the following to Buyer:
    a. The warranty deed, land contract or assignment of land contract required by this Agreement.
    b. A bill of sale for any Personal Property (described in Exhibit "D").
    c. A written assignment by Seller of Seller's interest in all leases and a transfer to Buyer of all security deposits, accompanied by the original or a true copy of each lease.
    d. An assignment of all Seller's rights under any Service Contracts described in Exhibit F which are assignable by their terms and which Buyer wishes to assume, together with an original or true copy of each Service Contract assigned.
    e. A notice to any tenants advising the tenants of the sale and directing that future payments be made to Buyer.
    f. An updated accounting of Recoverable Expenses.
    g. Payment of the County and State real estate transfer tax.
    h. Any other documents required by this Agreement to be delivered by Seller.

18. **Buyer's Closing Obligations.** At closing, Buyer shall deliver to Seller the following:
    a. The cash portion of the purchase price specified in this Agreement shall be paid by cashier's check or other immediately available funds, as adjusted by the apportionments and assignments in accordance to this Agreement.
    b. A written assumption by Buyer of the obligations of Seller under the leases arising after closing, including an acknowledgement of the receipt of all security deposits.
    c. Any other documents required by this Agreement to be delivered by Buyer.

19. **1031 Tax Deferred Exchange.** Upon either party's request, the other party shall cooperate and reasonably assist the requesting party in structuring the purchase and sale contemplated by this Agreement as part of a tax deferred, like-kind exchange under Section 1031 of the Internal Revenue code of 1986, as amended; provided, however, that in connection therewith, the non-requesting party shall not be required to (a) incur any additional costs or expenses; (b) take legal title to additional real property (i.e. the requesting party's "replacement property" or "relinquished property"); or (c) agree to delay the closing.

20. **Earnest Money.** Buyer shall deposit earnest money in the amount of $ _5,000_ with _Devon Title_, Escrow Agent [insert name of Broker, Title company or other] ☐ with this offer or ☒ within _five_ ( 5 ) days after acceptance of this offer, evidencing Buyer's good faith to be held by the Escrow Agent and to apply to the purchase price or the down payment portion thereof where applicable. If Buyer fails to timely deposit the earnest money, Seller may (but is not required to) provide written notice to Buyer of Buyer's failure and to provide Buyer with an additional two (2) business days after the date of the Buyer's receipt of the Seller's written notice to cure such failure after which time if Buyer has not cured its failure, Seller may immediately terminate this Agreement upon written notice to Buyer. If this offer is not accepted, or the title to the Premises is not marketable, or if the purchase is contingent upon conditions specified that cannot be met, Buyer's earnest money deposit shall be promptly refunded. If the Buyer defaults, all deposits made may be forfeited as liquidated damages at Seller's election, or alternatively, Seller may retain Buyer's earnest money as part payment of the purchase price and pursue Seller's legal or equitable remedies against Buyer. If the sale is not closed according to its terms, the selling Broker may notify Buyer(s) and Seller(s) of Escrow Agent's intended disposition of the earnest money deposit, and all parties shall be deemed to have agreed to the disposition of the earnest money deposit unless Escrow Agent is notified of a court action pending concerning this sale or disposition of the earnest money deposit within thirty (30) days after notice to the parties.

21. **Disclosure of Price and Terms.** The purchase price and the terms of this sale may be disclosed by the Commercial Alliance of REALTORS® listing platform (CARWM) in the ordinary conduct of its business. Deletion of this paragraph shall not be considered a counteroffer that would require a counter acceptance.

22. **Advice of Counsel.** Buyer acknowledges that the Broker has recommended that the parties retain an attorney or attorneys to review the terms of this Agreement.

23. **Attorney's Fees.** In the event of litigation arising from the failure or alleged failure of either party to perform its obligations under this Agreement, the party prevailing in that litigation (including appeals of all levels) shall be entitled to collect its court costs and reasonable attorneys' fees incurred in connection with such litigation from the other party. The provisions of this Section shall survive Closing or termination of this Agreement.

Property Address _____
©Commercial Alliance of REALTORS 2023-2024
Revision Date 5/2023

[JC] Buyer's Initials     [initials] Seller's Initials

**Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property**   Page 5 of 8

24. **Brokerage Fee.** Seller and/or Buyer agree(s) to pay the broker(s) involved in this transaction a brokerage fee as specified in any agency agreement or other written agreement between them. In the event no such agreement exists, ☐ Buyer ☒ Seller agrees to pay a brokerage fee of _____**per listing agreement**_____. This brokerage fee shall be paid in full promptly after it is earned, but not later than any applicable closing. Unless otherwise previously agreed, Buyer and/or Seller agree(s) that the brokerage fee may be shared by the recipient with any cooperating broker who participates in the sale, in such amount as the recipient decides, without further disclosure to or consent from Buyer and/or Seller. Seller and Buyer agree that the broker(s) involved in this transaction is an intended third-party beneficiary that is entitled to enforce the obligation set forth herein to pay the brokerage fee. Other:

**Seller acknowledges that if a commission is owed under a prior agreement, execution of this agreement will not eliminate the prior agreement.**

25. **Environmental.**
    a. **Notice to buyers and sellers (environmental risks).**
    Whenever real property is acquired or occupied, the buyer incurs some degree of risk with regard to potential environmental contamination and/or protected natural resources on the property. Various federal, state, and local laws may impose liability upon the buyer for the remediation of the contamination even though the buyer did not cause it or may restrict the buyer's ability to fully develop or utilize the property. Such risk can be minimized through the performance of environmental due diligence. Additionally, sellers are advised that they may have an obligation to provide certain environmental information and/or disclosures to prospective buyers. The failure to provide such information or disclosures may subject a seller to potential liability or result in the loss of certain liability protections.

    No real estate brokers/salespersons in this transaction possess the expertise necessary to assess the nature or extent of these environmental risks or to determine the presence of environmental contamination or protected natural resources. The real estate brokers/salespersons involved in this transaction do not make independent investigations as to environmental contamination or protected natural resources with respect to any property, and they make no representations regarding the presence or absence, now or in the past, of environmental contamination. It is therefore prudent for each party to this transaction to seek legal and technical counsel from professionals experienced in environmental matters to provide an evaluation of the environmental risks associated with the transaction.

    b. **Environmental reports and assessments.**
    (1) Within **five** (**5**) days of the Effective Date, Seller shall deliver to Buyer copies of any existing reports, data, plans, permits, notices and/or information in Seller's possession relating to environmental matters pertaining to the Premises ("Seller's Environmental Documents").

    (2) Buyer shall have a period of **forty-five** (**45**) days after the Effective Date to evaluate environmental matters relating to the Premises ("Environmental Due Diligence Period"). Buyer and Buyer's agents shall have the right to enter upon the Premises during the Environmental Due Diligence Period during reasonable business hours for the purpose of conducting, at Buyer's expense, any environmental assessments of the Premises that Buyer deems appropriate, which assessments may include, but shall not be limited to, a Phase I Environmental Site Assessment, Transaction Screen, and/or evaluation of other regulated conditions or matters such as wetlands, asbestos containing materials, mold, or lead based paint ("Environmental Assessments"). The Environmental Assessments may not include the collection or analysis of samples of soil, groundwater, soil gas, indoor air, surface water, building components or any other environmental medium unless Buyer obtains prior written consent from Seller, which consent shall not be unreasonably withheld, delayed or conditioned. Buyer agrees that the Environmental Assessments shall not unreasonably interfere with the rights of Seller or any tenants in possession and Seller agrees to reasonably cooperate and to request that its tenants reasonably cooperate with the Environmental Assessments.

    (3) Buyer shall have the right to terminate this Agreement if Seller's Environmental Documents or the Environmental Assessments are not acceptable to Buyer by delivering written notice to Seller prior to the expiration of the Environmental Due Diligence Period. If Buyer determines that any additional environmental due diligence activities (including, but not limited to, any additional environmental investigations, reports, approvals or permits) are warranted, then Buyer may provide Seller with a proposed amendment to this Agreement to extend the Environmental Due Diligence Period to allow Buyer to conduct such activities. If Buyer does not deliver a termination notice or proposed amendment to Seller prior to the expiration of the Environmental Due Diligence Period, then Buyer shall be deemed to have waived any objections to environmental matters relating to the Premises. If Buyer provides Seller with a proposed amendment to this Agreement, then Seller shall have a period of **five** (**5**) days to execute or negotiate mutually acceptable terms for such amendment, otherwise Buyer may, but shall not be obligated to, terminate this Agreement by delivering written notice to Seller with two (2) days after Seller's deadline for executing or negotiating an amendment to this Agreement.

    (4) If the Environmental Assessments cause any damage to the Premises, Buyer agrees to reasonably restore the Premises to the condition that existed prior to such damage. The restoration obligation does not require the remediation of any existing environmental condition. Buyer shall indemnify, defend and hold Seller and Broker harmless from and against any damage to persons or property caused by Buyer or Buyer's agents in conducting the Environmental Assessments.

    c. **Nondisclosure.**
    (1) If Seller's Environmental Documents or the Environmental Assessments identify the Land as a "facility" as defined in Part 201 of Michigan's Natural Resources and Environmental Protection Act, Public Act 451 of 1994, as amended ("NREPA") or a "site" as defined in Part 213 of NREPA, then Buyer may conduct a Baseline Environmental Assessment ("BEA") and/or a Due Care Plan ("DCP"); provided, however, that Buyer may not submit or otherwise disclose such BEA, DCP, or similar report (e.g., a response activity plan) to the Michigan Department of Environmental Quality prior to closing unless Buyer obtains prior written consent from Seller.
    (2) If Buyer exercises its right to terminate this Agreement pursuant to subparagraph b(3) above, Buyer shall not disclose Seller's Environmental Documents or the Environmental Assessments to any third party unless required by mandatory disclosure pursuant to legal process. At Seller's request, Buyer shall provide copies of any Environmental Assessments to Seller.

    d. **Other:**

Property Address _____
©Commercial Alliance of REALTORS 2023-2024
Revision Date 5/2023

[initials] Buyer's Initials     Seller's Initials

**Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property**   Page 6 of 8

26. **Other Provisions.** If any conflict shall exist between the provisions of this Section and the provisions contained elsewhere in this Agreement, the provisions of this Section shall control.

    * Provisions contained in the Addendum attached hereto

    * Buyer's preferred title company is Devon Title.

27. **Notices.** Any notice required or permitted to be given hereunder shall be deemed to have been properly given, if in writing and delivered to the parties at the addresses shown below or to their representative Agent listed in this Agreement, and shall be deemed received (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgement, (b) one (1) business day after having been deposited for next day overnight delivery with a nationally recognized overnight courier service, (c) two (2) business days after having been deposited in any U.S. post office or mail depository and sent by certified mail, postage prepare, return receipt requested, or (d) upon sending, if sent by email.

28. **Electronic Communications.** Any addendum or amendment to this Agreement and/or any other written communication given in connection with this Agreement may be delivered in person or, if to Seller, in care of Seller's Agent or, if to Buyer, in care of Buyer's Agent, via email or by facsimile transmission to the parties or the Agents at their respective email addresses or facsimile numbers, as applicable. Seller represents and warrants that an email address has been provided to the Agent of Seller from which Seller may receive email. Buyer represents and warrants that an email address has been provided to the Agent of Buyer from which Buyer may receive email.

29. **Wire Fraud:** Wire fraud is an increasingly common problem. Any electronic communication received by Buyer or Seller directing Buyer or Seller to transfer funds or provide nonpublic personal information (such as social security numbers, drivers' license numbers, wire instructions, bank account numbers, etc.), should be verified. **Even if the communication appears to be from the Broker, Title Company, or Lender, DO NOT** reply until you have verified the authenticity of the communication by direct communication with the Broker, Title Company, or Lender. **DO NOT** use any telephone numbers provided in the original communication when verifying the authenticity of the communication. Such requests may be part of a scheme to steal funds or use your identity. By signing this Agreement, Buyer and Seller acknowledge and understand the risks associated with wire transfers and potential fraud, which are not within the reasonable control of the Broker. Accordingly, Buyer and Seller hereby release and hold Broker harmless from any and all claims, demands, losses, rights, and causes of action of whatever kind and nature arising directly or indirectly from any wire transfer sent or received in connection with this Agreement.

30. **Execution.** The parties agree that electronic signatures and initials on this Agreement, or any addendum or amendment to this Agreement, shall be deemed to be valid and binding upon the parties as if the original signatures or initials were present in the documents in the handwriting of each party.

31. **Additional Acts.** Buyer and Seller agree to execute and deliver such additional documents and to perform such additional acts after the closing as may become necessary to effectuate the transfers contemplated by this Agreement.

32. **Authority of the Parties.** Each of the undersigned individuals who have signed this Agreement on behalf of Seller and Buyer entities represent and warrant that he/she is authorized to sign this Agreement on behalf of such party and to bind such party to the requirements of this Agreement.

33. **Entire Agreement.** This Agreement contains the entire agreement of the parties with respect to the sale of the Premises. All contemporaneous or prior negotiations have been merged into this Agreement. This Agreement may be modified or amended only by written instrument signed by the parties to this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

    For purposes of this Agreement, the phrase, "Effective Date of this Agreement" ("Effective Date") shall be the date upon which this Agreement is fully executed (as described below).

34. **Time.** Time is of the essence in this Agreement. In any case where a date for performance by either party or a deadline falls on a Saturday, Sunday or federal government holiday, the time for performance or the deadline, as applicable, shall automatically extend until 11:59 p.m. on the next business day. As used in this Agreement, a "business day" shall mean a day other than Saturday, Sunday or a federal government holiday.
    All other references to "days" in this Agreement shall refer to calendar days. The term "Effective Date" as used in this Agreement shall be the date upon which this Agreement is fully executed (as described below).

Property Address
©Commercial Alliance of REALTORS 2023-2024
Revision Date 5/2023

[TC]  Buyer's Initials        [initials]  Seller's Initials

Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property       Page 7 of 8

35. **Index of Exhibits.** Seller to furnish within _____ (____) days from Effective Date unless specified below:

| Not Applicable | Attached | Exhibit # | Subject |
|---|---|---|---|
| X | | A | Income and expense with respect to the operation of the Premises |
| X | | B | Written leases and any tenancies not arising out of written leases |
| X | | C | Commission Agreements |
| X | | D | List of personal Property |
| X | | E | Accounting of Recoverable Expenses, with an updated Accounting of Recoverable Expenses to be delivered no later than _____ days prior to the closing. |
| X | | F | Service Contracts |

As to any "Seller to furnish" item(s) listed above, Buyer shall have the right to terminate this Agreement if any such item is not acceptable to Buyer by giving Seller written notice within _____ (____) days after receipt of such item(s), otherwise the right to terminate this Agreement pursuant to this paragraph shall be deemed to have been waived. Notwithstanding the foregoing, Buyer shall not be permitted to terminate this Agreement based upon the updated Accounting of Recoverable Expenses received prior to closing.

36. **By signing below, Buyer acknowledges having read this Agreement and authorizes delivery of this Agreement to Seller.** If this Agreement is signed by Seller without any modifications, the date Seller signs becomes the Effective Date. Buyer gives Broker above named until **12:00 PM** (time) **10/4/2024** _____ (date) to obtain Seller's written acceptance of the Buyer's offer.

Buyer: **T.M.T. Realty Holdings, L.L.C.**
(print name of individual or entity)

Signature: **John T. C___**

Its: **PRESIDENT**
(if Buyer is an entity)

Date: **9/30/2024**

Buyer's Address: **548 AVE. A**
**BATTLE CREEK, MI 49037**

Buyer: _____
(print name of individual or entity)

Signature: _____

Its: _____
(if Buyer is an entity)

Date: _____

Bus. Phone: _____   Fax: _____

Email: _____

37. **SELLER'S ACCEPTANCE**

The above offer is hereby accepted   ☐ as written   ☐ as modified

Date: _____   Time: _____



Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family Property    Page 8 of 8

By signing below, Seller acknowledges having read and authorizes delivery of this Agreement to Buyer. If this Agreement is signed by Seller without any modifications, the date Seller signs becomes the **Effective Date**. If this Agreement is signed by Seller subject to any modifications, Seller gives Broker above named until _____ (time) _____ (date) to obtain Buyer's written acceptance of Seller's counter offer.

Seller: _Kevin M. Smith_ (print name of individual or entity)

Signature: _[signed]_

Its: _Attorney for Trustee_ (if Seller is an entity)

Date: _10/16/24_

Seller's Address: _____

Seller: _____ (print name of individual or entity)

Signature: _____

Its: _____ (if Seller is an entity)

Date: _____

Bus. Phone: _____ Fax: _____

Email: _____

### 38. BUYER'S RECEIPT OF ACCEPTANCE

Date: _____ Time: _____

Buyer acknowledges receipt of Seller's acceptance of Buyer's offer. If Seller's acceptance of Buyer's offer was subject to a counter-offer, Buyer agrees to accept the terms of the counter offer:

☐ as written (with all other terms and conditions of Buyer's offer remaining unchanged); or   ☐ modified as follows:

If Buyer is accepting a counter offer from Seller as written, the date Buyer signs below becomes the **Effective Date**. If Buyer is accepting Seller's counter offer subject to any modifications, Buyer gives Broker above named until _____ (time _____) (date) to obtain Seller's written acceptance of Buyer's counter offer.

Buyer: _____ (print name of individual or entity)

Signature: _____

Its: _____ (if Buyer is an entity)

Date: _____

Buyer: _____ (print name of individual or entity)

Signature: _____

Its: _____ (if Buyer is an entity)

Date: _____

### 39. SELLER'S RECEIPT OF ACCEPTANCE

Date: _____ Time: _____

Seller acknowledges receipt of a copy of Buyer's acceptance of Seller's counter offer (if Seller made a counter offer), or Seller agrees to accept the terms of Buyer's counter offer as written. If Seller is accepting the terms of Buyer's counter offer as written, then the date Seller signs below becomes the **Effective Date**.

Seller: _____ (print name of individual or entity)

Signature: _____

Its: _____ (if Seller is an entity)

Date: _____ (if Seller is an entity)

Seller: _____ (print name of individual or entity)

Signature: _____

Its: _____ (if Seller is an entity)

Date: _____ (if Seller is an entity)

Property Address _____
©Commercial Alliance of REALTORS 2023-2024
Revision Date 5/2023

☐ ☐  Buyer's Initials    ☐ ☐ _[initialed]_  Seller's Initials

## ADDENDUM TO
## BUY AND SELL AGREEMENT
## FOR OFFICE, COMMERCIAL, INDUSTRIAL, AND MULTI-FAMILY

This Addendum to Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family ("Addendum") is made and entered into as of this 16th day of October, 2024, and is attached to and made a part of that certain Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family dated as of even date herewith ("Agreement") by and between Kelly M. Hagan, Trustee of the Bankruptcy Estate of Orbit Marketing, LLC, a Michigan limited liability company ("Seller"), and T.M.T. Realty Holdings, L.L.C., a Michigan limited liability company ("Buyer").

1. Condition Precedent. Buyer's and Seller's obligations under the Agreement, as modified by this Addendum, are conditioned upon approval of the transaction contemplated in the Agreement, as modified by this Addendum ("Court Approval"), by U.S. Bankruptcy Court for the Western District of Michigan (the "Court"). Upon receipt of Court Approval, $1,500.00 of the $5,000.00 Earnest Money described in Section 20 of the Agreement shall be non-refundable. The remaining $3,5000.00 shall remain refundable through the 45-day inspection period described in Section 7 of the Agreement.

2. Section 4(A). In Section 4(A) of the Agreement, the phrase ", subject to the adjustments and apportionments set forth in this Agreement" is added after the phrase "full purchase price".

3. Section 5. The phrase "adversely and materially affects the value of the Premises or Buyer's intended use of the Premises" as set forth in the second sentence of Section 5 of the Agreement, is deleted in its entireties and replaced with the following: "is not satisfactory to Buyer, in Buyer's sole discretion…"

4. Section 6.

   a. The word "closing" is deleted in its entirety at the end of the first sentence of Section 6 of the Agreement and replaced with the phrase "the recording of the Trustee's deed to be delivered by Seller to Buyer at the Closing."
   b. The phrase "adversely and materially affects the value of the Premises or Buyer's intended use of the Premises" as set forth in the fourth sentence of Section 6 of the Agreement, is deleted in it entireties and replaced with the following: "is not satisfactory to Buyer, in Buyer's sole discretion…"
   c. The following additional language is added at the end of Section 6 of the Agreement: "Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, Buyer shall not be required to object to any encumbrances which secure monetary obligations and such monetary encumbrances shall be discharged by Seller at or prior to the Closing."
   d. At any time prior to the Closing, Buyer and/or its representatives, agents and prospective lender(s) shall have the right to enter upon the Premises at all reasonable times with 24-hour notice to Seller to conduct surveys, appraisals, engineering test, inspections and for such other purposes as Buyer deems reasonably necessary to evaluate the Premises.

5. Section 7. The third sentence of Section 7 of the Agreement is hereby deleted in its entirety and replaced with the following: "Buyer shall have the right to terminate this Agreement if the inspections are not acceptable to Buyer for any reason or no reason at all by giving Seller and Escrow Agent written notice within forty-five (45) days after the receipt of Court Approval and

57547624.7

immediately receive the remaining refundable portion of the Earnest Money, equal to $3,500.00, otherwise the right to terminate shall be deemed to have been waived and the Earnest Money shall be non-refundable except as otherwise provided herein."

6. Section 8. The following language is added to Section 8 of the Agreement: "Seller shall pay all real estate transfer taxes and documentary stamps. Seller to pay for title insurance policy. Buyer to pay for any endorsements to the title insurance policy and recording costs of the deed."

7. Section 9. The following language is added to Section 9 of the Agreement: "All taxes and assessments which are due and payable as of the date of the Closing shall be paid in full by Seller at the Closing."

8. Section 13. Sections 13.c. through 13.h. of the Agreement are hereby deleted in their entirety. The following additional representations, warranties and covenants are added to Section 13 of the Agreement:

    a. Seller has all necessary power and authority to enter into this Agreement with Buyer, to convey or cause to be conveyed title to the Premises in the condition required under this Agreement and to perform all of its other obligations under this Agreement.
    b. No work has taken place on the Premises in the last one hundred twenty (120) days which would create in any party a right to a lien against any of the Premises, except for such work that has been fully paid for by Seller.
    c. There are no pending special assessments, condemnation, zoning or other proceedings or litigation with respect to the Premises, nor is any such proceeding or litigation threatened with respect to the Premises. There are no real estate tax protests or proceedings affecting the Premises.
    d. To Seller's best knowledge, the Premises are not in violation of any restrictive covenants, law, ordinance, rule, regulation or requirement affecting the Premises.
    e. There are no leases, contracts, agreements of sale, options, rights of first refusal or offer, licenses, employment agreements, parking agreements, unrecorded easements, utility or concession agreements, agreements with municipalities, or any other similar agreements, oral or written, relating to, affecting or binding on the Premises or any part thereof.
    f. From the date of this Agreement until and through the date of the Closing or termination of this Agreement, Seller shall: (i) not transfer the Premises or any portion thereof or create on the Premises or any portion thereof any easements, liens, mortgages, encumbrances or other interests; (ii) not enter into any contracts, leases, licenses or other commitments regarding the Premises, without the prior written consent of Buyer; (iii) continue to maintain and repair the Premises in at least the manner which Seller has previously maintained and repaired the Premises and keep in effect Seller's existing policies of public liability and hazard and extended coverage insurance insuring the Premises; (iv) comply with all laws or municipal ordinances, regulations, orders or requirements affecting the Premises; (v) deliver notice to Buyer of (a) any suits or claims affecting the Premises that Seller has or received knowledge of, or (b) any actual or threatened condemnation of any portion of the Premises that Seller has received knowledge of; (vi) pay all taxes, assessments, and operating expenses (as hereinafter defined) with respect to the Premises; and (vii) not do anything to cause a change in the title to the Premises.
    g. To Seller's best knowledge, there are no Hazardous Materials present in, on or about the Premises and no release of Hazardous Materials has occurred on the Premises in violation of Environmental Laws. Neither Seller nor its agents have released or caused to be released or allowed their agents to release any Hazardous Materials in, on, or about the Premises. "Environmental Laws" means all federal, state, local and municipal environmental laws

      (including, without limitation, principles of common law), rules, statutes, directives, binding written interpretations, binding written policies, ordinances and regulations issued by any governmental and quasi-governmental bodies or agencies having jurisdiction over the Premises or any portion thereof (collectively, the "Authorities") with respect to or which otherwise pertain to or affect the Premises or any portion thereof, or the development, use, ownership, occupancy or operation of the Premises or any portion thereof, and as the same have been amended, modified or supplemented from time to time prior to and are in effect as of the Effective Date. "Hazardous Material(s)" means any hazardous or toxic materials, substances, pollutants, chemicals or wastes governed, regulated or restricted by any Environmental Law.

  h.  Seller and its representatives and agents agree not to negotiate with respect to the Premises or offer the Premises for sale or sell or offer any interest therein or any interest in Seller, to any other parties during the term of this Agreement, unless required to do so by the Court in order to obtain Court Approval ("Remarket"). In the event that Seller is required to Remarket the Premises, Seller shall promptly notify Buyer of the same and Buyer shall have the opportunity to bid in response to the Remarketing of the Premises in accordance with the bidding terms accepted by the Court. In the event Seller receives a bona fide offer (which the Court is willing to approve) from an unrelated third party to purchase the Premises, Buyer may, at its option, revise its offer, and if the Court is willing to approve the terms of such revised offer from Buyer, Seller must proceed to sell the Premises to Buyer in accordance with such terms.

As a condition precedent to Buyer's obligation to close, all of the representations and warranties of Seller shall be true as of the date of the Agreement and as of the date of the Closing. All of Seller's representations and warranties shall survive the Closing.

9. <u>Section 15</u>. The first sentence of Section 15 of the Agreement is deleted in its entirety and replaced with the following:
"Closing shall be held on or before the date that is sixty (60) days following Court Approval, unless extended by mutual written consent of the parties. However, if the Seller fails to obtain bankruptcy court approval by December 4, 2024, then the Agreement shall become null and void unless extended by mutual written consent of the parties."

10. <u>Section 16</u>. Section 16 of the Agreement is deleted in its entirety and replaced with the following: "Seller shall tender to Buyer exclusive possession of the Premises upon completion of the Closing, subject to the rights of no persons whatsoever."

11. <u>Section 17</u>. Sections 17.a. through 17.f. of the Agreement are hereby deleted in their entirety. The following items are added to Section 17 of the Agreement as items i., j., and k.:

    i.    An owner's affidavit required by the Title Company to delete the standard exceptions.
    j.    A non-foreign person certification.
    k.    A Trustee's claim deed, in a form reasonably acceptable to Seller and Buyer.

12. <u>Sections 21 and 22</u>. Sections 21 and 22 of the Agreement are deleted in their entirety and replaced with the following: "Intentionally Deleted."

13. <u>Section 33</u>. The following sentence is added following the fourth sentence of Section 33 of the Agreement:
"Disputes regarding this Addendum and the Agreement shall be heard by the Court."

14. <u>Assignment</u>. The Buyer may, at any time prior to the Closing, assign the Agreement and its right to purchase the Premises hereunder to any entity that is controlled by Buyer or its principals.

15. <u>Default and Remedies</u>. Notwithstanding any provisions of the Agreement to the contrary, Seller and Buyer agree as follows:

    a. <u>Buyer's Default; Seller's Remedy</u>. If the Buyer fails to close on the purchase of the Premises, due to Buyer's material default under the Agreement, and provided that the Seller is not otherwise in material default of the Agreement, then Seller shall be entitled to the full amount of the Deposit as liquidated damages as Seller's sole and exclusive remedy, and upon payment to Seller of such amount, this Agreement and all rights and obligations of the parties shall terminate.
    b. <u>Seller's Default; Buyer's Remedies</u>. In the event Seller fails to timely perform any material act, or provide any material document or information required to be provided by Seller, or in the event any representation and warranty made by Seller pursuant to this Agreement is untrue when made, then Buyer shall be entitled to either (i) terminate this Agreement, demand a refund of the Deposit and seek Buyer's actual damages arising from Seller's breach; or (ii) seek specific performance of this Agreement, and/or seek Buyer's actual damages.

16. <u>No Material Adverse Change</u>. Notwithstanding anything to the contrary contained in the Agreement, it shall be a condition precedent to Buyer's obligation to close the transaction contemplated under the Agreement that there shall have been no material adverse change with respect to the Premises prior to the Closing.

17. <u>Miscellaneous</u>. In the event of a conflict or inconsistency between this Addendum and any other terms of the Agreement, the terms of this Addendum shall govern. Except as provided herein, all other terms of the Agreement shall continue in full force and effect. The terms of this Addendum may only be modified by a writing executed by both parties. This Addendum and the Agreement may be executed in multiple counterparts. Facsimile or electronic signature copies of this Addendum and the Agreement shall be enforceable and of the same effect as original signatures. All references to the Agreement are intended to also include the terms and provisions of this Addendum. The prevailing party in any legal proceeding brought under or with relation to this Agreement or transaction shall be entitled to recover court costs, reasonable attorneys' fees and all other reasonable litigation expenses from the non-prevailing party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

57547624.7

**[SIGNATURE PAGE TO ADDENDUM TO BUY AND SELL AGREEMENT FOR OFFICE, COMMERCIAL, INDUSTRIAL, AND MULTI-FAMILY]**

Seller and Buyer have executed this Addendum to Buy and Sell Agreement for Office, Commercial, Industrial, and Multi-Family as of the date first set forth above.

**SELLER:**

_____
Kevin M. Smith, authorized agent of Kelly M. Hagan, Trustee of the Bankruptcy Estate of Orbit Marketing, LLC, a Michigan limited liability company

**BUYER:**

T.M.T. Realty Holdings, L.L.C.,
a Michigan limited liability company

By: _____
Name: JOHN T. CARR
Its: PRESIDENT

57547624.7

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN (GRAND RAPIDS)**

**IN THE MATTER OF:**

| | |
|---|---|
| Orbit Marketing, LLC<br>dba Climax Solar<br>dba Climax Electrical Service<br>dba Option 1 Genetics | Bankruptcy Case No. 24-01123-swd<br>Honorable Scott W. Dales<br>Chapter 7 |
| Debtor._____/ | |

**ORDER GRANTING TRUSTEE'S MOTION FOR AUTHORITY TO SELL PROPERTY OF THE BANKRUPTCY ESTATE PURSUANT TO 11 U.S.C. 363(b) AND FOR THE PAYMENT OF BROKER'S COMMISSION**

PRESENT: **HONORABLE JUDGE DALES**
United States Bankruptcy Judge

This matter having come before this Honorable Court based upon the Trustee's Motion for Authority to Sell Real Property Pursuant to 11 U.S.C. 363(b) and Payment of Broker's Commission ("Motion") filed on October 21, 2024, docket number ***; the defined terms in the Motion having the same meaning in this Order; no objections having been filed to the Trustee's Motion; or any filed objection having been resolved; notice having been provided properly pursuant to Rule 2002 and 9019 of the Federal Rules of Bankruptcy Procedures; and the Court being fully advised in the premises;

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that the Trustee's Motion is granted in all respects.

**IT IS FURTHER ORDERED** that the Trustee is authorized to sell the Real Property described as parcel of real estate located in the City of Springfield, Calhoun County, Michigan to wit:

SP City Sec 3 T2S R8W Com W 1/4 Post, N 00°32'52" W 48.54 Ft to POB, N 00°32'52" W 201.47 ft, S 89°48'42" E 233.02 Ft, S 00°32' 52" E 235.32 ft to N R/W of Ave A, N 87°09'10" W 182.81 Ft, N 14°31'01" W 26.82 ft, S 89°27'18" W 44.04 ft to POB 1.05 acres +/- (the "Real Property") and more commonly known as 598 Avenue A, Springfield, MI pursuant to 11 U.S.C §363(b).

**IT IS FURTHER ORDERED** that the Trustee is authorized to pay a commission of 4% of the gross sales price to Weichert Realtors Platinum and NAI Wisinski of West Michigan as seller's broker ("Broker"), with an additional 3% being paid to Buyer's broker.

**IT IS FURTHER ORDERED** that Kelly M. Hagan, Trustee, or her attorneys, are authorized to execute all documents necessary to consummate the sale of the Real Property as set forth in the Motion including the discharge of the Calhoun County Judgment Lien.

**IT IS FURTHER ORDERED** that the fourteen-day stay period set forth in Rule 6004(h), Federal Rules of Bankruptcy Procedure, is hereby waived.

### END OF ORDER

Prepared by:
Kevin M. Smith (P48976)
Beadle Smith, PLC
P.O. Box 70656
Rochester Hills, MI 48307
(586) 850-1492

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN (GRAND RAPIDS)**

**IN THE MATTER OF:**

| | |
|---|---|
| Orbit Marketing, LLC<br>dba Climax Solar<br>dba Climax Electrical Service<br>dba Option 1 Genetics | Bankruptcy Case No. 24-01123-swd<br>Honorable Scott W. Dales<br>Chapter 7 |

                 Debtor.
_____/

**NOTICE OF REQUIREMENT OF WRITTEN RESPONSE TO TRUSTEE'S MOTION FOR AUTHORITY TO SELL PROPERTY OF THE BANKRUPTCY ESTATE PURSUANT TO 11 U.S.C. 363(b) AND PAYMENT OF BROKER'S COMMISSION**

      The Trustee has filed Trustee's Motion for Authority to Sell Property of the Bankruptcy Estate Pursuant to 11 U.S.C. 363(b), and to Pay Closing Costs and Broker's Commission ("Motion") regarding 598 Avenue A, Springfield, MI.

      The Trustee's Motion is on file in the offices of the Clerk of United States Bankruptcy Court, Western District of Michigan, One Division Ave., NW, Room 200, Grand Rapids, Michigan, where it may be inspected during the regular Court hours. Persons seeking further information regarding these matters are invited to make inquiry to Trustee or her counsel.

      **Your rights may be affected.** **You should read these papers carefully and discuss them with your attorney, if you have one.**

      If you do not want the Court to grant the relief requested, then not later than <u>21</u> days of the date of this Notice, you or your attorney must:

1. File with the Court a written response to the Motion explaining your position, pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 9013 (W.D.M.), at:

    United States Bankruptcy Court, Western District of Michigan
    One Division Ave., N.W., Room 200, Grand Rapids, Michigan 49503

    If you mail your response to the Court for filing, you must mail it early enough so that the Court will **receive** it on or before the date stated above.

    You must also mail a copy to: Kevin M. Smith, Attorney for Trustee [see address below]

    **Please refer to Administrative Order 2004-06 (Mandatory Electronic Filing), effective January 1, 2005, for practices and procedures for filing pleadings with the Court.**

2. If a written response is filed, the Court will schedule a hearing on the Motion and send you notification of the date, time and place of such hearing. If no response is filed, a hearing will not be held and the requested relief of the Trustee will be granted.

**If you or your attorney do not take these steps, the Court may deem that you do not oppose the Motion, in which event the relief requested in the Motion will be granted.**

                BEADLE SMITH, PLC

                /S/ Kevin M. Smith
                By: Kevin M. Smith (P48976)
                Attorneys for Trustee
                P.O. Box 70656
                Rochester Hills, MI 48307
                (586) 850-1492

Date Served:   10/21/24         Ksmith@bbssplc.com